Marquette Sharif WHITE, Appellant,

v.

UNITED STATES, Appellee.

No. 12–CM–138.

District of Columbia Court of Appeals.

Argued Dec. 5, 2012.

Decided June 20, 2013.

Michael L. Spekter, Washington, DC, for appellant.

Christine Macey, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, John P. Mannarino, and Margaret Barr, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and THOMPSON and EASTERLY, Associate Judges.

EASTERLY, Associate Judge:

While driving his nine-year-old son to football practice, Marquette Sharif White was pulled over by the police because (according to the credited suppression-hearing testimony of one of the police officers) items were hanging from his rearview mirror, obstructing the view out the front windshield. But instead of being told the reason he had been stopped or being asked for his license and registration, as in an ordinary traffic stop, Mr. White was ordered out of his car, handcuffed, and moved to the rear of his vehicle, toward the cruiser driven by the police. While in handcuffs, separated from his son, and without having been given any explanation from the police about what was going on, Mr. White was asked by one officer whether he had "anything illegal" in his car. He responded that he had a joint in his pants. After giving the joint to the officer, he said he was just taking his son to football practice and he was sorry. He was subsequently charged with misdemeanor possession of marijuana.[1] In the trial court and now on appeal, Mr. White asserts that he was questioned by the police while in cus-

tody without the protection of *Miranda* warnings.[2]

Looking at the totality of the circumstances, we agree that, at the time he was questioned by the police, a reasonable person in Mr. White's position would have felt restrained to a " 'degree associated with a formal arrest.' "[3] Thus we hold that he was in *Miranda* custody and that the trial court erred in denying his motion to suppress. We remand to permit Mr. White, who entered a conditional guilty plea after his suppression motion was denied, to decide whether to withdraw his plea.

## I. Facts and Procedural History

At approximately 6:00 p.m. on October 28, 2011, Mr. White was driving his nine-year-old son to football practice; his son was seated in the back seat and was dressed in "football attire." When Mr. White reached the 1400 block of Montana Avenue, N.E., however, his trip was interrupted when he was pulled over by two officers in a police cruiser who used "lights and sirens" to execute the stop. The officers exited their car and approached Mr. White's vehicle from both sides.

The officers did not inform Mr. White why they had pulled him over, and they did not ask him for his license and registration. Instead, Officer John Wright, the officer who approached Mr. White from the driver's side, "[i]mmediately asked [Mr. White] to step out of the vehicle, place his hands behind his back, and he was placed in handcuffs." The officers "stepped" Mr. White, handcuffed, to the back of his car, in the direction of the police cruiser.[4]

---

1. D.C.Code § 48–904.01(d) (Supp.2011).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *In re I.J.,* 906 A.2d 249, 255 (D.C.2005) (quoting *California v. Beheler,* 463 U.S. 1121,

1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)).

4. Although the record is not explicit, it appears that Mr. White's son remained in Mr. White's vehicle.

When Mr. White reached the rear of his vehicle, the officers gave him no additional information about why they had stopped him, why they had put him in handcuffs, or what they were going to do with him. Instead, Officer Wright immediately asked Mr. White whether there was anything illegal in his vehicle. Mr. White said no, but then added that he had "a J" in his pants, which Officer Wright understood to mean a joint. Officer Wright did a pat down of Mr. White and found nothing of concern. Officer Wright then removed Mr. White's handcuffs and asked him to retrieve the joint. Mr. White complied and gave Officer Wright the joint. The officers also searched the car but found no other contraband. Officer Wright testified that, throughout this encounter, Mr. White was "very cooperative." He told the officers that he was just taking his son to football practice and that he was very sorry.

After Mr. White was charged with misdemeanor possession of marijuana, he moved to suppress his statements to the police and the joint as the products of questioning in the absence of *Miranda* warnings.[5] Officer Wright testified at the suppression hearing that he and his partner had been assigned to a vice unit on the evening of Mr. White's arrest. The focus of the unit was on prostitution, narcotics, and weapons. Officer Wright testified that he pulled Mr. White over because baby shoes were hanging from his rearview mirror, obstructing the view out the front windshield. Officer Wright explained that he had been instructed to conduct traffic stops whenever an object was hanging from the rearview mirror so as to obstruct the driver's view.

Officer Wright testified that he does not as a matter of course handcuff individuals he has stopped for traffic violations, but that he handcuffed Mr. White for two reasons: (1) because the area was "a very high narcotics area, specifically, PCP, which is a very dangerous drug" and (2) because, as he approached the car, he saw Mr. White appear to stuff something into his pants, which gave rise to a concern that Mr. White might be armed. Officer Wright acknowledged that he had placed handcuffs on Mr. White so that he could be "detained." Officer Wright testified that Mr. White was not free to leave at that point.

After hearing testimony from Officer Wright, the trial court denied Mr. White's motion to suppress pursuant to the Fifth Amendment. The trial court determined that, at the time of the questioning, Mr. White was not in custody so as to require the protection of *Miranda* warnings. Mr. White then entered a conditional plea pursuant to Super. Ct.Crim. R. 11(a)(2). Mr. White received a sentence of ninety days in jail, execution suspended, and six months of supervised probation. This appeal followed.

## II. Standard of Review

In reviewing a denial of a motion to suppress, we defer to the trial court's findings of fact unless clearly erroneous and consider all inferences in favor of the prevailing party. *Griffin v. United States,* 878 A.2d 1195, 1198 (D.C.2005) (citing *Mitchell v. United States,* 746 A.2d 877, 881 n. 2 (D.C.2000)). However, we review *de novo* all legal questions, including whether a suspect was in custody for pur-

---

5. Mr. White also moved to suppress the statements and the physical evidence as a violation of the Fifth Amendment's voluntariness requirement separate from *Miranda,* and he moved to suppress the physical evidence on the ground that his Fourth Amendment rights were violated when Officer Wright seized him and searched him and his car. He does not press these arguments on appeal.

poses of *Miranda. Id.; see also In re I.J.,* 906 A.2d 249, 261–62 (D.C.2005) ("This court will defer to the trial court's findings of fact, but will evaluate *de novo* whether, on those facts, the person was in custody.").

### III. Analysis

■■■■ The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This constitutional rule governs only the evidence the government may use against a defendant at trial. By its literal terms, it precludes the prosecution's use at trial of a defendant's involuntarily made or "compelled" statements. And pursuant to *Miranda,* it also precludes the prosecution's use in its case-in-chief of statements that have been elicited during custodial interrogation without the benefit of "prophylactic warnings ... which inform criminal defendants of various constitutional rights," *In re I.J.,* 906 A.2d at 255, regardless of whether those unwarned statements would otherwise be considered "compelled."[6] *Miranda* warnings are required whenever a suspect is both (1) in custody and (2) under interrogation. *See, e.g., In re D.W.,* 989 A.2d 196, 200 (D.C.2010). In this case, the government has never argued that Mr. White was not under interrogation when Officer Wright asked him if he had any contraband in his car.[7] Thus, the only question before us is whether Mr. White was in *Miranda* custody when the police questioned him.

■■■■ "In evaluating whether a person was in custody [for *Miranda* purposes], 'the only relevant inquiry is how a reasonable man [or woman] in the suspect's position would have understood his [or her] situation.'"[8] *In re I.J.,* 906 A.2d at 256 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). A court must look to the totality of the circumstances "surrounding the interrogation" and then determine whether a reasonable person in those circumstances would "'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)); *see also United States v. Turner,* 761 A.2d 845, 851 (D.C. 2000) ("The test for determining whether a person is in custody is an objective one ... 'based upon looking at the totality of the circumstances.'" (brackets omitted) (quoting *Patton v. United States,* 633 A.2d 800, 814 (D.C.1993))). The mere fact that a suspect has been detained by the police, however, is not sufficient to constitute *Miranda* custody:

"Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to

---

**6.** Pursuant to *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the government may still use non-Mirandized statements for impeachment. *Id.* at 226, 91 S.Ct. 643 ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements.").

**7.** The Supreme Court has said interrogation refers to "any words or actions on the part of

the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted).

**8.** "The reasonable person test presupposes an innocent person." *United States v. Turner,* 761 A.2d 845, 851 (D.C.2000) (quoting *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

resolve 'the ultimate inquiry': was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *In re I.J.,* 906 A.2d at 256 (brackets omitted) (quoting *Keohane,* 516 U.S. at 112, 116 S.Ct. 457 (internal quotation marks omitted)). In conducting this inquiry, the court " 'must be informed by the underlying purpose of the *Miranda* rule, namely to protect individuals from compelled self-incrimination.' " *Id.* (quoting *Resper v. United States,* 793 A.2d 450, 456 (2002)).

As noted above, our focus must be on how a reasonable person in Mr. White's shoes would have perceived his situation at the time he was questioned. Because Mr. White was questioned in the course of a traffic stop, we begin our analysis with the Supreme Court case addressing whether traffic stops may constitute custody so as to trigger the requirement to provide *Miranda* warnings.

### A. Under *Berkemer,* a traffic stop may constitute *Miranda* custody.

The Supreme Court addressed whether *Miranda* applies to "questioning of motorists detained pursuant to traffic stops" in *Berkemer,* 468 U.S. at 427, 104 S.Ct. 3138. The defendant in *Berkemer* had been pulled over for "weaving in and out of a lane" on the highway. *Id.* at 423, 104 S.Ct. 3138. He subsequently told the police, in response to an inquiry into whether he had used any intoxicants, that he had consumed two beers and several joints. *Id.* The government argued in *Berkemer* that *Miranda* categorically did not apply "[w]hen the police arrest a person for allegedly committing a misdemeanor traffic offense and then ask him questions without telling him his constitutional rights." *Id.* at 429, 104 S.Ct. 3138.

The Supreme Court rejected the government's argument, holding that "a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda,* regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." *Id.* at 434, 104 S.Ct. 3138 (footnote omitted). The Court noted that "the incentive for the police to try to induce the defendant to incriminate himself may well be substantial" even where the suspect is being questioned about a misdemeanor traffic violation, and that "[s]imilar incentives are likely to be present when a person is arrested for a minor offense but the police suspect that a more serious crime may have been committed." *Id.* at 432–33, 104 S.Ct. 3138. Ultimately, the Court eschewed any bright-line rule that "would enable the police to circumvent the constraints on custodial interrogations established by *Miranda.*" *Id.* at 441, 86 S.Ct. 1602.

Having determined that the protections of *Miranda* could apply to a traffic stop and that the totality of the circumstances should always be considered in order to determine whether a suspect is in custody, the Court went on to hold that, on the facts of *Berkemer,* "the roadside questioning of a motorist detained pursuant to a routine traffic stop" did not constitute custodial interrogation. *Id.* at 435, 442, 104 S.Ct. 3138. The Court said that, for an "ordinary traffic stop," people detained for brief questioning are generally not "in custody." *Id.* at 439–40, 104 S.Ct. 3138. In coming to this conclusion, the Court noted "[t]wo features of an ordinary traffic stop [that] mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely' ": (1) ordinary traffic stops are "presumptively temporary and brief," and (2) the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.*

at 437–38, 104 S.Ct. 3138 (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602). Still, the Court reiterated that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" *Id.* at 440, 104 S.Ct. 3138 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)).

■ *Berkemer* prompts a preliminary question: Could the stop in this case have reasonably been perceived as an ordinary traffic stop? We think not. Indeed, Officer Wright acknowledged that it was not; he testified that, when he stops an individual for a moving violation, it is not his standard practice to remove that individual from his vehicle and place him in handcuffs. This testimony aligns with what a reasonable person would expect in an ordinary traffic stop. A person would expect a police officer to tell him what he had done wrong—that he was driving 40 miles per hour in a 25-mile-per-hour zone, or that he failed to completely stop at a stop sign, or that objects hanging from his rearview mirror unlawfully obstructed his view out the windshield.[9] A person would expect to be asked to provide the police with his license and registration.[10] A person would expect to get a ticket or perhaps a warning. A person might expect to remain in his car or even to be told to do so.[11] In short, a reasonable person subjected to an ordinary traffic stop would be given a number of cues signaling "traffic stop" and suggesting that he would be only briefly detained and then be "allowed to continue on his way."[12] This was not that sort of stop.

**B. Based on the totality of the circumstances, Mr. White was in custody.**

■ To say this was not the routine traffic stop envisioned by the Supreme Court in *Berkemer* does not answer the dispositive question: Was it *Miranda* custody? We acknowledge that " 'the task of defining "custody" is a slippery one.' " *In*

9. *See e.g., Mitchell v. United States*, 746 A.2d 877, 882 (D.C.2000) ("Officer Gaudioso told him that he was illegally parked and asked to see his driver's license and registration."); *United States v. Walters*, 563 F.Supp.2d 45, 47 (D.D.C.2008) ("Sergeant Monahan approached the vehicle first to inform Walters of the reason for the traffic stop and asked for Walters' license and registration.").

10. *See, e.g., supra*, note 9; *see also United States v. Coley*, 974 F.Supp. 41, 43 (D.D.C. 1997) (The officer "approached the car and asked defendant, who was driving, for his vehicle registration"); *United States v. Green*, 776 F.Supp. 565, 566 (D.D.C.1991) ("Officer Crespo asked the driver for his license and the car's registration.") *aff'd*, 1 F.3d 45 (D.C.Cir.1993).

11. *See Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir.2013) ("The instruction to reenter the car might be considered a component of a motor vehicle stop because in a typical automobile stop occupants would be told to re- main in their car."); *see, e.g., Johnson v. United States*, 33 A.3d 361, 373–74 (D.C.2011) ("Having been told once to remain in the car, Johnson again tried to exit the car, which Officer Harvey clearly found suspicious and of concern."); *Basnueva v. United States*, 874 A.2d 363, 366 (D.C.2005) ("Officer Marshall first told both occupants to remain inside the car"). We do not suggest that an officer's decision to tell a driver to exit his vehicle places the driver in custody for purposes of *Miranda*.

12. *Berkemer*, 468 U.S. at 437, 104 S.Ct. 3138 ("A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.").

re D.W., 989 A.2d at 201 (quoting Oregon v. Elstad, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). There is no bright-line rule to save courts from " 'occasionally [having] difficulty deciding exactly when a suspect has been taken into custody.' " Id. (quoting Berkemer, 468 U.S. at 441, 104 S.Ct. 3138). We must look to the totality of the circumstances of this traffic stop to assess how a reasonable person in Mr. White's shoes would have perceived his situation. We focus "not only [on] what the police d[id] but also [on] what they sa[id]." In re I.J., 906 A.2d at 260.

■ The police initiated their encounter with Mr. White by removing him from his car and immediately placing him in handcuffs. Handcuffing does not neces-

sarily transform an investigative detention into an arrest, but it is recognized as " 'a hallmark of a formal arrest.' " Al–Mahdi v. United States, 867 A.2d 1011, 1023 (D.C. 2005) (quoting United States v. Newton, 369 F.3d 659, 676 (2nd Cir.), cert. denied, 543 U.S. 947, 125 S.Ct. 371, 160 L.Ed.2d 262 (2004)).[13] This court has on numerous occasions pointed to the absence of handcuffing as a reason why a defendant was not in custody for purposes of Miranda.[14] By contrast, neither this court nor the Supreme Court has published an opinion in which it determined that a suspect in handcuffs was not in Miranda custody.[15]

■ Of course, handcuffing is not dispositive of Miranda custody;[16] it must be

13. See also Colorado v. Connelly, 479 U.S. 157, 172, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("When the officer whom respondent approached elected to handcuff him and to take him into custody, the police assumed a fundamentally different relationship with him."); United States v. Maguire, 359 F.3d 71, 79 (1st Cir.2004) (describing " 'the use of handcuffs' " as " 'one of the most recognizable indicia of traditional arrest' " (quoting United States v. Acosta–Colon, 157 F.3d 9, 18 (1st Cir.1998))); United States v. Glenna, 878 F.2d 967, 970 n. 2 (7th Cir.1989) (noting the magistrate judge's statement "[t]hat handcuffs are restraints on freedom of movement of the type normally associated with arrest is too obvious to require discussion").

14. See, e.g., In re A.J., 63 A.3d 562, 568 (D.C. 2013) (noting that juvenile "was not handcuffed or otherwise restrained"); Bates v. United States, 51 A.3d 501, 510 (D.C.2012) (noting that "[a]ppellant was neither handcuffed nor physically restrained in any way" prior to making the statement (footnote omitted)); In re J.F., 987 A.2d 1168, 1176 (D.C. 2010) (noting that appellant "was not treated as if he were being arrested" because, inter alia, "he was not handcuffed"); Green v. United States, 974 A.2d 248, 261 (D.C.2009) (noting that "[t]he record supports the trial court's findings that Mr. Green was not under formal arrest nor in handcuffs at the time he made the statement"); Graham v. United States, 950 A.2d 717, 729 (D.C.2008) (noting

that appellant was not handcuffed during the interview); McFadden v. United States, 945 A.2d 1203, 1205 (D.C.2008) (noting that the suspect "was unhandcuffed"); Moore v. United States, 927 A.2d 1040, 1060 (D.C.2007) (noting that "[t]here was no 'show of authority' that would have conveyed the message to [appellant] that he was being taken into police custody, as opposed to being stopped temporarily" where, inter alia, "[appellant] was not handcuffed"); Griffin v. United States, 878 A.2d 1195, 1198 (D.C.2005) (noting that suspect was grabbed by the scruff of the neck but "was not handcuffed"); see also Savoy v. United States, 981 A.2d 1208, 1216 (D.C.2009) (not explicitly discussing handcuffing but stating that "simply asking appellant to sit down on the curb while they searched his car does not rise to the level of having restrained his freedom of movement to the degree of formal arrest").

15. Two circuit courts have done so, however. See United States v. Cervantes–Flores, 421 F.3d 825, 830 (9th Cir.2005) (overruled on other grounds); United States v. Fornia–Castillo, 408 F.3d 52 (1st Cir.2005); United States v. Bautista, 684 F.2d 1286, 1292 (9th Cir.1982).

16. As we discuss below, see infra Part III.C, our Miranda custody analysis under the Fifth Amendment is distinct from any Fourth Amendment inquiry. Thus, our discussion of handcuffing here is not meant to have any Fourth Amendment import.

considered in context. But based on the totality of the circumstances of this case—where Mr. White was pulled over, not asked for his license and registration, removed from his car, isolated from his son, escorted toward a police cruiser, and then handcuffed with no explanation as to what he had done wrong and no assurance that he was not under arrest—we can readily see how the use of handcuffs would go a long way toward making a reasonable motorist feel as if he were at the mercy of the police and restrained to a degree associated with formal arrest.[17] In order to outweigh the use of handcuffs in this case, there would have to be some strong indications on the other side of the ledger that this was not *Miranda* custody.[18]

Nothing that the police said in this case, however, indicated to Mr. White that he was not under arrest. "Communications from the police to the suspect, in particular, may assuage the reasonable person's assessment of the situation, and militate against a finding of custody." *In re I.J.*, 906 A.2d at 260; *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993) ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention."). "For example, where the police specifically inform the suspect that she or he is not under arrest, and does not need to talk to the police, a stop for investigatory purposes is unlikely to be custodial. . . ." *In re I.J.*, 906 A.2d at 260 (citing *Resper,* 793 A.2d at 454); *McIlwain v. United States,* 568 A.2d 470, 472–73 (D.C.1989); *see also In re A.J.*, 63 A.3d at 568 (Juvenile detained as a truant was not in *Miranda* custody where he was "advised" that the police "would drive him to the address that [he] had provided, so that a parent would have the opportunity to corroborate [his] explanation regarding why [he] was not at school.").[19]

---

17. The government argues that "[a] reasonable person would have perceived the handcuffing for what it was—a brief precautionary measure." But we see no reason why this would be so. An ordinary citizen in Mr. White's circumstances would have had no reason to distinguish this detention from custody that is the functional equivalent of an arrest. Perhaps handcuffing is a familiar prophylactic procedure to those in law enforcement. *Cf. In re I.J.*, 906 A.2d at 257–58 (noting a " 'trend' " in *Terry* jurisprudence permitting the use of handcuffs and " 'other measures of force more traditionally associated with arrest than with investigatory detention' " (quoting *Hicks v. United States,* 730 A.2d 657, 660 (D.C.1999))). But to determine what is *Miranda* custody we do not look at the totality of the circumstances from the perspective of the reasonable police officer or prosecutor. *In re I.J.*, 906 A.2d at 256 ("In evaluating whether a person was in custody, *'the only relevant inquiry* is how a reasonable man in the suspect's position would have understood his situation.' " (emphasis added) (quoting *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138)).

18. The cases that the government cites from other jurisdictions acknowledge that handcuffing is a factor that must be considered; in these cases, however, courts simply did not find that the suspect was under arrest or the formal equivalent based on the totality of the facts presented. *See, e.g., Fornia–Castillo,* 408 F.3d at 63 (noting that " 'the degree of physical restraint placed upon the suspect' " is a factor in the custody analysis (quoting *United States v. Ventura,* 85 F.3d 708, 711 (1st Cir.1996))); *Bautista,* 684 F.2d at 1292 (citing "the degree of pressure applied to detain the individual" as one factor the court must consider); *Cervantes–Flores,* 421 F.3d at 830 (" 'Handcuffing a suspect does not *necessarily* dictate a finding of custody.' " (emphasis added) (quoting *United States v. Booth,* 669 F.2d 1231, 1236 (9th Cir.1981))).

19. Again, no one factor is dispositive and advising the suspect that he is not under arrest is not "a *sine qua non* for avoiding a finding of *Miranda* custody." *In re J.H.*, 928 A.2d 643, 650 (D.C.2007) (internal quotation marks omitted). However, "[i]t certainly is a relevant, and important, part of the totality of

Here, Mr. White was told nothing before he was questioned. Without explanation, he was pulled out of the car, placed in handcuffs, and "stepped" to the rear of his vehicle toward the police cruiser. He was not told why he had been placed in handcuffs. He was not told that he was *not* under arrest. He was not told that he would be permitted to return to both his car and his son after he answered a few questions. Moreover, Mr. White did not have the interaction with the police that a motorist subject to an ordinary traffic stop might reasonably expect—the request for the driver's license and registration coupled with an explanation of what the motorist has done to draw the attention of the police.[20] Such an interaction would have provided implicit if not express cues that the stop would be temporary. Thus the lack of communication coupled with the handcuffing likely reinforced Mr. White's perception that the police believed he had done something worthy of arrest. A person in Mr. White's position who would have reasonably expected one encounter—an ordinary traffic stop—was instead confronted with something that looked and felt like an arrest and was given no reassurance that he was not being hauled off to jail. This lack of communication supports Mr. White's contention that he was in *Miranda* custody.[21]

Furthermore, the nature of the questioning would not have reassured a reasonable person that the handcuffing was "a brief precautionary measure" as the government alleged. Questions that are inquisitorial in nature are likely to make an encounter with police more coercive. *See United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir.2007) (noting that "whether the nature and length of the officers' questioning was accusatory or coercive" factors into the custody analysis); *cf. United States v. Villa–Gonzalez*, 623 F.3d 526, 533 (8th Cir.2010) (discussing the coercive effect of inquisitorial questioning in the Fourth Amendment seizure context). There is nothing in the record regarding the tone of the officers' inquiry, but the substance of the question—which was not related to either traffic rules or any potential concern for officer safety—would indicate to a reasonable person that this was not an ordinary traffic stop.[22]

Looking at the totality of the circumstances Mr. White faced, we think his case is more analogous to cases in which courts have found defendants to be in custody than cases in which they have not. For example, in *United States v. Clemons*, the defendant was the driver of a car subjected to a traffic stop because it had two flat tires. 201 F.Supp.2d 142, 143 (D.D.C. 2002). After the officers pulled the car

---

the circumstances if the person being interviewed was told that he did not have to talk with the police officer and was, in fact, free to leave." *Id.*

**20.** See *supra* notes 9–11 and accompanying text.

**21.** *Compare Moore v. United States*, 927 A.2d 1040, 1059–60 (D.C.2007) (finding no custody where the officer asked a number of ordinary questions while the suspect remained seated in the car), *with United States v. Smith*, 3 F.3d 1088, 1097–98 (7th Cir.1993) ("Although Stewart had not been told whether he was under arrest, he was removed from the taxi-

cab in which he was riding, separated from his property and his associates and handcuffed.").

**22.** The questioning of Mr. White was not as coercive as, for example, confronting a suspect with a bag of illegal drugs, *see, e.g., Revels*, 510 F.3d at 1276, but given the context, asking Mr. White whether there was anything illegal in his car suggested that the police suspected him of transporting contraband and adds to the factors indicating to a reasonable person that he or she was under the functional equivalent of arrest.

over, they saw both the driver and his passenger making surreptitious movements in the car as if to hide things. *Id.* The police "subdued" the passenger when he tried to run and then "forcibly removed" the driver from the car. *Id.* The court ruled that the driver was "in custody for purposes of the Fifth Amendment after he was removed from the vehicle by [the police], put on the ground and handcuffed." *Id.* at 145. "Clearly he had been deprived of his freedom of action in a significant way, and any reasonable person would have understood that he was in custody and not free to leave." *Id.* We conclude that a determination of *Miranda* custody is equally warranted here.

 The government points to a number of other factors that, in its view, defeat custody in a totality of the circumstances analysis, but none alters the total picture in our view. Preliminarily, we reiterate that there is no checklist. We examine each case on its particular facts, and factors that may be given significant weight in one case may be less important in a different context; no single factor is dispositive. *See, e.g., In re D.W.,* 989 A.2d at 201 (noting that an individual "may be in custody even while remaining in his own home"); *McFadden v. United States,* 945 A.2d 1203, 1206 (D.C.2008) (finding no custody even though the suspect was questioned in a police station); *Turner,* 761 A.2d at 852 (finding custody even though the suspect was originally told he was free to leave); *United States v. Henley,* 984 F.2d 1040, 1042–43 (9th Cir.1993) (finding custody even though the suspect was told that he was not under arrest).

For example, the government notes that the encounter "involved only two police officers," and Mr. White "was not placed in a squad car or taken to the police station." But the police have a variety of means of detaining individuals, and they do not have to use all of them at once to make an individual feel restrained to the degree approaching arrest.

The government also points to the length of Mr. White's detention and notes that he was only handcuffed for the time that Officer Wright led him to the back of his vehicle toward the police cruiser and asked him whether there was anything illegal in the car. But again, we look at the detention from the perspective of a reasonable person in the position of the suspect. *United States v. Garreau,* 735 F.Supp.2d 1155, 1167 (D.S.D.2010) (noting that we must "'keep in mind that the custody determination is based on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned'") (brackets omitted) (quoting *United States v. LeBrun,* 363 F.3d 715, 720 (8th Cir.2004)), *aff'd,* 658 F.3d 854 (8th Cir.2011). Under the circumstances, that person would have no reason to know his detention would be brief or that the police would limit themselves to one investigative question. *Compare In re I.J.,* 906 A.2d at 257 (finding custody where the suspect was simply asked "what happened?" while sitting in private office at a youth home), *with In re A.J.,* 63 A.3d at 568 (finding no custody based in part on the brevity of the encounter where the suspect "knew that his companion had been immediately released upon providing corroboration of his account, and he had no reason to doubt that he would be treated in the same manner").

Invoking *Berkemer,* the government also notes that this detention was on the public street. But as noted above, the court in *Berkemer* "refused to rule out the possibility that a *Terry*-like traffic stop could mature into a more serious detention which would have to be considered custodial."

*United States v. Elias,* 832 F.2d 24, 26 (3d Cir.1987).

Looking at the totality of the circumstances of this case, we conclude that Mr. White was in custody when, in stark contrast to an ordinary traffic stop, he was removed from his car, immediately handcuffed, and brought to the rear of his car, toward the police cruiser and away from his nine-year-old son, without being asked for his license and registration and without being told what was happening. The fact that Mr. White was in *Miranda* custody when he made incriminating statements without the benefit of *Miranda* warnings should have precluded the government from using those statements against him at trial. Accordingly, Mr. White's statements should have been suppressed.

## C. The Government's *Terry* Arguments

The government asserts that Mr. White's *Miranda* "argument lacks merit because he was subject to no more than a *Terry* stop," and it spends a substantial portion of its brief defending the trial court's determination that the police properly detained Mr. White pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Mr. White rightly did not challenge the trial court's Fourth Amendment ruling on appeal, and the fact that Mr. White was properly detained by the police based on reasonable articulable suspicion and was not in fact under arrest at the time he made his statements is nonresponsive to Mr. White's *Miranda* claim.

The police unquestionably had authority to pull Mr. White over because his windshield was obstructed, and, under the circumstances, once they saw him making what they perceived to be a stuffing motion in his pants, they had reasonable articulable suspicion that he might be armed and concealing a gun in his waistband. Their decision to remove Mr. White from the car and place him in handcuffs until they ensured their safety is beyond reproach.[23] They also had the authority under *Terry* to briefly question Mr. White to allay their suspicions about a potential weapon.[24]

But what the police were authorized to do under the Fourth Amendment is, for purposes of the Fifth Amendment and *Miranda*, of limited relevance. As this court explained in *In re I.J.,* "the Fourth Amendment inquiry is not the same as, nor does it ultimately decide, the question of whether there was custody under the Fifth Amendment." 906 A.2d at 257; *see also Turner,* 761 A.2d at 851 ("On a fundamental level, 'seizure' and 'custody' are not synonymous." (citing *Patton v. United States,* 633 A.2d 800, 815 n. 7 (D.C. 1993))). The central inquiry under the Fourth Amendment is whether the actions of the police were reasonable—*i.e.,* whether they were taken with adequate justification. But "whether the police's tactics were reasonable is not the preoccupation of the Fifth Amendment," *In re I.J.,* 906

---

**23.** *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

**24.** We note, however, that although Officer Wright testified that he detained Mr. White because he was concerned Mr. White had a weapon on his person, the very first question that Officer Wright asked after he removed Mr. White from the car and put him in handcuffs was not was not, "do you have a gun," but rather, "is there anything illegal in the car?" *Cf. United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " (quoting *Terry,* 392 U.S. at 29, 88 S.Ct. 1868.)).

A.2d at 259, nor is it dispositive of the *Miranda* custody inquiry, which, as discussed above, turns on how the police's actions might reasonably be perceived and whether they might make an individual feel a degree of restraint associated with arrest. The fact that "an encounter may be a *reasonable* seizure within the scope of *Terry* for Fourth Amendment purposes does not automatically and necessarily remove it from *Miranda's* Fifth Amendment protections." *Id.* at 257; *see also In re D.W.*, 989 A.2d at 201 (noting that "[i]t is clear ... that an individual may be in custody even when he has not been formally arrested"). Thus, we have said:

> Should the circumstances so dictate, a person may be seized—stopped, frisked, handcuffed, detained, transported in a police vehicle to another location (including a police station) and briefly questioned—so as to allow a *Terry* investigation on reasonable articulable suspicion without the encounter being deemed an arrest, within the meaning of the Fourth Amendment, requiring probable cause. However, if the same tactics that may be permitted by the Fourth Amendment would cause a reasonable person in the suspect's situation to believe that his freedom of action has been curtailed to a degree associated with formal arrest, there is custody that triggers the additional protections of the Fifth Amendment.

*In re I.J.*, 906 A.2d at 260 (citation omitted). As we recognized in *I.J.* and reiterated in *A.J.*, "in many instances—perhaps most—a brief investigative *Terry* stop deemed reasonable under the Fourth Amendment will not trigger the protections of the Fifth Amendment," *In re A.J.*, 63 A.3d 562, 568 (D.C.2013) (quoting *I.J.*, 906 A.2d at 261), but that does not obviate the distinct analysis that we have said is required to determine whether an individual is in *Miranda* custody. In other words, even if it is true as a statistical matter that some large percentage of *Terry* stops do not constitute *Miranda* custody, because the requisite analyses under the Fourth and Fifth Amendments are different, identifying a stop as permissible under *Terry* does not tell us whether an individual who has been stopped is subject to a detention that constitutes *Miranda* custody.

## IV. Conclusion

We hold that the trial court erred in denying Mr. White's motion to suppress his statements to the police, which were elicited while he was in custody without the benefit of *Miranda* warnings.[25] After the court denied his motion, Mr. White entered a conditional guilty plea under Super. Ct.Crim. R. 11(a)(2), which authorizes a "defendant who prevails on appeal ... to withdraw the plea." We remand to the trial court to allow Mr. White to withdraw his guilty plea in light of our ruling.

*So ordered.*

---

**25.** On appeal Mr. White argues that both his statements and the evidence recovered as a result of those statements should have been suppressed. But he provided no authority for this proposition and the government never addressed it in its brief. Two days before oral argument, the government for the first time called this court's attention to *United States v. Patane*, 542 U.S. 630, 634, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (holding that the Fifth Amendment did not require the suppression of the physical fruits of a non-Mirandized, voluntary statement) in a letter submitted pursuant to D.C. Appellate Rule 28(k), but when asked about *Patane* at oral argument, the government was not prepared to take a position on that case. The defense was similarly unprepared. We decline to reach an issue that neither party has addressed in their briefs or at oral argument.