*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-964

BRAVON M. FREEMAN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-5644-18)

(Hon. Judith A. Smith, Trial Judge)

(Argued June 24, 2021                 Decided May 5, 2022)

*Dennis M. Hart* for appellant.

*Jeffrey S. Nestler*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman* and *Chimnomnso Kalu*, Assistant United States Attorneys, were on the brief for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and GREENE, *Superior Court Senior Judge.*[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

GREENE, *Senior Judge, Superior Court of the District of Columbia*: Appellant Bravon M. Freeman challenges the trial court's denial of a motion to suppress a handgun and related evidence that Metropolitan Police Officers found during a traffic stop on December 29, 2017. He argues that the officers who conducted the warrantless search did not have reasonable suspicion of a crime and that any evidence found was the result of an illegal search and should have been suppressed. We affirm.

## I.     Background

Appellant was charged in a six-count indictment with Unlawful Possession of a Firearm, Carrying a Pistol Without a License, Possession of an Unregistered Firearm, Unlawful Possession of Ammunition, Possession of a Large Capacity Ammunition Feeding Device, and Possession of an Open Container of Alcohol, in violation of D.C. Code §§ 22-4503(a)(1) (2021 Supp.), 22-4504(a) (2021 Supp.), 7-2502.01(a) (2018 Repl.), 7-2506.01(3) (2018 Repl.), 7-2506.01(b) (2018 Repl.), and 25-1001(a)(2) (2021 Supp.).

The charges all arose the night of December 29, 2017, when officers from the Metropolitan Police Department ("MPD") initiated a traffic stop of a vehicle in

which appellant was a passenger. The police searched the car and found open containers of alcohol, drug paraphernalia, and an unlicensed handgun. Appellant was arrested, and subsequently moved to suppress the physical evidence recovered. The Honorable Judith Smith presided over the suppression hearing on February 8, 2019, in which the two police officers involved testified for the government.

## A. Suppression Hearing

Officer Luke Mundt testified that on the night of December 29, 2017, he and Officer Nelson Torres were patrolling in Northwest D.C. in a marked scout car as part of MPD's crime suppression unit. Mundt testified that part of their duties with that unit involved traveling to "high crime" areas in order to "suppress the amount of crime that might be going on" and to "attempt to conduct investigations into illegal narcotics, weapons offenses[,] and various other crimes." He said that they were driving in the 600 block of Park Road around 11:00 pm when they saw a dark-colored sedan with tinted windows exit the Park Morton public housing complex[1] and drive in the opposite direction from them.

---

[1] Officer Mundt referred to the complex as the "Park Morton housing projects."

Officer Mundt turned his scout car around to follow the sedan, even though he had not observed it involved in any traffic violations.[2] During cross-examination, Officer Mundt explained that he followed the sedan because he was "concern[ed] [about] where it exited from." He said that he followed it for approximately one to one-and-a-half minutes. The sedan turned onto North Capitol Street, described by Officer Mundt (at the point he observed the sedan) as a four-lane road, with two lanes traveling north and two lanes traveling south. The sedan was in the far right lane, traveling southbound. Officer Mundt testified that the officers followed in their scout car, and around the 2300 block of North Capitol Street, he saw the sedan "veer" toward the other lane and that both of the vehicle's driver's-side wheels briefly touched, but did not cross, the dashed white paint lines separating the northbound lanes of North Capitol Street. About one block later, Officer Mundt testified, he observed the sedan make the same "swerving motion" again, and that in each of these instances, the sedan failed to engage its turn signal.

After the second "swerving motion," Officer Mundt stated, he initiated a traffic stop because he had just "witnessed two infractions for failure to maintain

---

[2] Officer Mundt testified that the tint on the sedan's front windows "appeared to be not in compliance" with District tinting laws, but that because he was not "window tint-certified," that was not the reason he initiated the traffic stop.

lane." He also explained that as a trained field sobriety officer, he "felt that it was imperative that [he] stop the vehicle to investigate" whether the driver was possibly impaired.

Officer Mundt testified that he approached the driver's side of the car, and Officer Torres approached the passenger side, where appellant was seated. Officer Mundt said that the driver[3] of the car "appeared to be nervous." Officer Mundt told the driver that he had pulled the car over for failure to maintain its lane, and asked the driver for his license, vehicle registration, and insurance. The driver responded that he had forgotten his license, but handed Officer Mundt a U.S. passport instead. Officer Mundt testified that he did not see any contraband while he talked to the driver.

Officer Torres testified that as he approached the passenger side of the car, he could smell and see marijuana smoke coming from the front windows. Like Officer Mundt, Officer Torres said that when he first approached the car, he did not see any contraband in plain view. However, Officer Torres did notice an empty cardboard box on the floor by appellant's feet. He recognized the packaging was for the tequila

---

[3] The driver of the car pleaded guilty to possession of a controlled substance, but as his record is now sealed, we do not identify him here.

brand "Patron," and he asked appellant where the bottle was. In response to Officer Torres' question, appellant "manipulate[d] the box by his feet" to reveal a glass bottle. Officer Torres asked appellant to hand him the bottle, and after confirming that it contained alcohol with "a little less than a shot left," he placed it on the roof of the car.

Officer Torres asked the driver to step out of the car and moved him to the street curb behind the car. He then asked appellant to exit the car and had him wait next to the driver. Officer Torres informed both men that based on the open container of alcohol found in the car, the police were going to conduct a search for additional containers of alcohol in the vehicle.

Additional officers from the crime suppression unit arrived and helped search the sedan. Officers recovered plastic cups in the door pockets containing a substance that smelled like alcohol, an unlicensed handgun in the glove box, marijuana and "edibles" from the front center console, and marijuana from a book bag in the backseat. As part of Officer Torres' testimony, the government played a portion of his Body Worn Camera ("BWC") footage. Officer Torres specifically pointed out the partially visible "Patron" box at appellant's feet.

## B. Trial Court's Ruling

On March 1, 2019, Judge Smith denied appellant's motion to suppress. She credited the testimony of the two officers, and noted that although Officer Mundt "made fairly clear his contempt for, or, at a minimum, a dislike of Park Morton residents," he was "candid, specific and grudgingly willing to concede any contradictions in his testimony and in any reports."

Judge Smith found that Officer Mundt testified credibly that he saw the sedan appellant was riding in twice "swerve" into the painted lines dividing the right-side lane from the left on North Capitol Street. She stated that the word "swerve" is "somewhat of a strong word" for the circumstances, but that Officer Mundt had also used the word "veer" to describe the action of the vehicle touching the dividing lines and then correcting itself. She noted that Officer Mundt was candid that the sedan never actually crossed the dividing line, but that he believed that touching the line was a failure by the driver to maintain his or her lane under 18 D.C.M.R. § 2201.6 (2019). That regulation, Judge Smith noted, requires vehicles to "be driven as nearly as practicable within a single lane and . . . not be moved from that lane until the driver has first ascertained that such movement can be made with safety."

Judge Smith found it unnecessary to determine whether simply touching the dividing lines actually violated the regulation or not, because an officer's mistake of law will not invalidate the stop as long as the belief was reasonable. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014). Judge Smith found that Officer Mundt's belief that touching the line violated the regulation was reasonable even if it was mistaken. She explained that the belief was reasonable because "[w]ithin a single lane could reasonably be interpreted to mean that driving on the line is not within the lane." Judge Smith also noted that even if the car's tires did not actually cross the line, she found it "highly probable" that at least some part of the car, such as the sideview mirrors, did cross the divider and therefore created "a traffic safety issue that is, presumably, the basis for the regulation."

Judge Smith found that even though the traffic infraction was "relatively minor in the scheme of violations" and was potentially even pretextual, the stop was valid because an individual officer's subjective motivations for initiating a stop are irrelevant. *See Whren v. United States*, 517 U.S. 806, 813 (1996). She further found that the officers had a sufficient reason to "step[] both [appellant] and the driver out of the car" because the driver failed to produce his driver's license and because appellant smelled like marijuana and had ashes on his pants. Accordingly, Judge

Smith ruled that the subsequent search was valid and denied appellant's motion to suppress the physical evidence obtained from it.

Following the trial court's denial of his motion to suppress, appellant agreed to a stipulated trial that incorporated the officers' testimony and BWC footage. Appellant also stipulated to the following facts: MPD Officer Heather Shea responded to the scene of the car's stop and found a black and silver handgun in the glovebox. D.C. Department of Forensic Services chemist Dia Ryan also responded to the scene of the traffic stop and assisted with recovering the black and silver .40 caliber handgun with serial number SCU57831. Ms. Ryan also recovered a .40 caliber firearm with a 15-round capacity magazine, and swabbed the firearm and the magazine for DNA. DFS chemist Stephanie Hickey tested the DNA and "concluded that there was extremely strong support" to show that appellant's DNA profile was included in the mixture tested. Appellant was not licensed to carry a firearm, and he had previously been convicted of an offense carrying a possible punishment of more than one year in prison. Judge Smith found that appellant was "freely and voluntarily" entering into the stipulations and waiving his right to a jury trial. She then found appellant guilty of all six charges in the indictment. Appellant timely appealed the denial of his motion to suppress.

## II.   Analysis

"Our review of a trial court's ruling on a motion to suppress is narrow in scope, *Womack v. United States*, 673 A.2d 603, 607 (D.C.1996), limited to ensuring that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Zanders v. United States*, 75 A.3d 244, 247 (D.C. 2013) (internal quotation marks, brackets, and citation omitted). "We view the evidence and all reasonable inferences therefrom in favor of sustaining the trial court's ruling." *Ramsey v. United States*, 73 A.3d 138, 142-43 (D.C. 2013) (internal ellipses and quotation marks omitted). We review the trial court's legal conclusions de novo, "but the trial court's factual findings are left alone unless they are clearly erroneous." *Zanders*, 75 A.3d at 247.

### A. Appellant's Fourth Amendment Claim

Appellant's first argument is that the police violated his Fourth Amendment right to be free from unreasonable seizures when they stopped the vehicle he was traveling in. Specifically, appellant contends that the officers did not have reasonable suspicion of a traffic violation when the car in which appellant was traveling twice touched the lines dividing one lane from another.

In this case, Officer Mundt waited to initiate a traffic stop until he saw the vehicle in which appellant was a passenger twice "veer" on top of the painted, dashed lines separating one lane from another. 18 D.C.M.R § 2201.6 provides:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all other rules consistent with this subtitle shall apply: (a) A vehicle shall be driven as nearly as practicable *entirely* within a single lane and shall not be moved from that lane until the driver has first ascertained that such movement can be made with safety.

(Emphasis added.) The regulation does not define what it means to stay "within a single lane," and there appears to be no case law from this jurisdiction interpreting the requirement. Appellant argues that Officer Mundt possessed "a mistaken understanding of the scope of a legal prohibition" in believing that touching, but not crossing, the painted line dividing two lanes violates 18 D.C.M.R. § 2201.6. Courts in other jurisdictions, when interpreting similar regulations, have reached divergent results about whether driving on top of but not crossing the painted white line constitutes a violation. We agree with those courts that have found it to be a violation.[4]

---

[4] *See, e.g.*, *United States v. Williams*, 945 F. Supp. 2d 665, 671-72 (E.D. Va. 2013), in which the court ruled that "a driver who drives his vehicle on the boundary lines violates" the Virginia statute requiring that vehicles be driven "as nearly as practicable entirely within a single lane," "regardless of whether the driver actually crosses over the boundary lines." *See also United States v. Bassols*, 775 F. Supp. 2d

"Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure and *subject matter*." *Baltimore v. District of Columbia*, 10 A.3d 1141, 1146 (D.C. 2011) (emphasis added) (internal quotation marks and citation omitted). With those considerations in mind, and reading the District's provision in the context of the purpose and subject matter of the D.C.M.R. traffic regulations as a whole, we are satisfied that the analyses of the *Williams* and *Bassols* courts are correct.

First, as the court in *Williams* observed, "the Ninth Circuit in *Colin* began its analysis of the issue by noting that neither the California statute nor state case law defines 'drive as nearly as practical entirely within a single lane.'" *Williams*, 945 F. Supp. 2d at 673 n.5; *see also Colin*, 314 F.3d at 443. In contrast, as in *Williams*, the D.C.M.R. provides relevant definitions which guide our interpretation. 18 D.C.M.R. § 2201.6 requires a vehicle to "be driven as nearly as practicable entirely within a

---

1293, 1301 (D.N.M. 2011) (*see infra*). *Compare United States v. Colin*, 314 F.3d 439, 444-45 (9th Cir. 2002), holding that a vehicle observed drifting onto the solid white fog line on the far side of the right lane of a highway and traveling along the fog line for approximately ten seconds, and thereafter drifting to the left side of the left lane where its left wheels traveled along the solid yellow line for approximately ten seconds, did not violate §21658(a) of the California Vehicle Code, which required that a vehicle be driven "as nearly as practical entirely within a single lane" and "not be moved from the lane until such movement can be made with reasonable safety."

single lane" whenever upon a "roadway" that has been divided into lanes. Under 18 D.C.M.R. § 9901.1, a roadway is "that portion of a highway which is improved, designed, or ordinarily used for vehicular travel." A highway is defined as "the entire width between the boundary lines of every publicly maintained way." *Id.*

After considering identically worded definitions under Virginia law, the court in *Williams* concluded that, because "a lane of travel by definition constitutes the area *between* the boundary lines . . . on each side of the lane" as per the definition of a highway, driving on top of the line violates the statute "regardless of whether the driver actually crosses over the boundary lines." *Williams*, 945 F. Supp. 2d at 672 (emphasis in original).

Finally, in resolving this issue in favor of appellee here, we find most compelling the reasoning of the District Court in *United States v. Bassols*. There, the Court expressly declined to follow the Ninth Circuit's interpretation in *Colin*, noting that it would "lead[] to an absurd result" if the statute was interpreted to allow for touching the line, because it would mean that "two vehicles could legally occupy the same physical space at the same time despite the fact that the vehicles would collide," clearly contrary to the safety purposes of the statute. *Id.* at 1300-01. Moreover,

a vehicle that is driving with its tire on a lane marker even poses a risk to other vehicles that are not also driving on, but are close to, the lane marker. Thus, the only way to construe [the statute] without reaching a result that permits two vehicles to occupy the same physical space is to conclude that the "single lane" contemplated by [the legislature] encompasses only that portion of the roadway that is between the lines of stripes that demarcate the "single lane." Because the lane ends at the point that the lane marker begins, a driver who drives on a lane marker has necessarily failed to drive entirely within a single lane.

*Id.* at 1301.[5]

In sum, the relevant definitions in the D.C.M.R. and the practical and safety concerns that would result from a different interpretation, persuade us that driving on the dividing line, even if not crossing it, is a violation of 18 D.C.M.R. § 2201.6. Accordingly, Officer Mundt's stop of the sedan was reasonable, and no constitutional violation occurred.

**B. Appellant's Fifth Amendment Claim**

---

[5] This case, of course, does not involve a vehicle being operated where the line encroached upon separates a lane of travel from the road's edge or shoulder, sometimes called a "fog line." *See State v. Turner*, 170 N.E.3d 842 (Ohio 2020). Nor does it involve a vehicle encroaching on the line closest to its lane of travel where a double line separates it from another lane. We do not purport to opine upon those scenarios, which are not presented here.

Appellant also argues that Officer Torres violated his Fifth Amendment rights when he asked appellant where the "Patron" bottle was. Appellant failed to raise his Fifth Amendment claim in his pre-trial motion to suppress, first raising the issue orally at the suppression hearing. Judge Smith did not rule on the issue, and appellant failed to seek a ruling.

"A party who neglects to seek a ruling on his motion fails to preserve the issue for appeal." *Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009) (quoting *Thorne v. United States*, 582 A.2d 964, 965 (D.C. 1990)). As appellant failed to preserve this claim, we review it only for plain error. *Howerton v. United States*, 964 A.2d 1282, 1286 (D.C. 2009). The "plain error" standard requires that appellant demonstrate that there was "(1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Jones v. United States*, 124 A.3d 127, 129 (D.C. 2015) (citation omitted).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The Supreme Court has interpreted this right to mean that the government may not use any statements made by a criminal defendant during a "custodial interrogation"

without "demonstrat[ing] the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, *Miranda* warnings are only required when the defendant is subject to (1) custody, and (2) interrogation. *In re I.J.*, 906 A.2d 249, 255 (D.C. 2006). We have stated that "[c]ustodial interrogation for *Miranda* purposes turns on whether there [is] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Castellon v. United States*, 864 A.2d 141, 152 (D.C. 2004) (internal quotation marks, brackets, and citations omitted). Therefore, to determine whether appellant's Fifth Amendment rights were violated, the initial question is whether he was in custody for *Miranda* purposes at the time he responded to Officer Torres' question about the "Patron" bottle.

The Supreme Court has explained, and this court has repeatedly affirmed, that individuals are not generally in "custody" for *Miranda* purposes during routine traffic stops. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 435-41 (1984) (the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for the purposes of the *Miranda* rule); *Karamychev v. District of Columbia*, 772 A.2d 806, 809 (D.C. 2001) ("[A]n individual who has been temporarily detained for a traffic stop generally is not considered to be 'in custody' for purposes of *Miranda*.").

However, we have noted that there are exceptions to this general rule.  For example, in *White v. United States*, we held that an individual was in *Miranda* custody during a traffic stop when the officers "initiated their encounter with [the defendant] by removing him from his car and immediately placing him in handcuffs."  68 A.3d 271, 279 (D.C. 2013).  We noted that "[h]andcuffing does not necessarily transform an investigative detention into an arrest, but it is recognized as a hallmark of a formal arrest."  *Id.* (internal quotation marks and citations omitted).  In addition to handcuffing, we noted in *White* that the police did not ask for the defendant's license or registration, did not tell him what he had allegedly done wrong, and did not assure him that he was *not* under arrest.  *Id.* at 280.  Based on the totality of the circumstances, we found that the defendant was in *Miranda* custody because the circumstances would indicate to a reasonable person that this was not "an ordinary traffic stop."  *Id.* at 281.

In contrast to *White,* the circumstances here were much closer to a "routine traffic stop" that the Supreme Court has expressly held does not constitute custody for purposes of *Miranda*.  When Officer Torres approached appellant in the front passenger seat, he told appellant that it was "no big deal" that he was smoking marijuana, and directed him to listen to Officer Mundt explain why they had initiated

the traffic stop. At that point, appellant had reason to believe that the encounter was a routine traffic stop because the police had told them that they stopped the car for a traffic violation. Additionally, Officer Mundt's request that the driver provide his license, registration, and insurance information reinforced the appearance that this was a routine traffic stop. Only seconds later, while appellant was still seated in the car, did Officer Torres notice the "Patron" box and ask appellant about the bottle. Both the fact that Officer Torres asked this question almost immediately after Officer Mundt had requested standard identification documents, and the fact that appellant was still seated in the vehicle, militate against a finding of custody. It takes more than stopping a vehicle for a traffic infraction and asking the occupants a few questions for police action to constitute a "formal arrest" or its functional equivalent.

Because we conclude that appellant was not in *Miranda* custody when Officer Torres asked him about the "Patron" bottle, we need not decide whether the question constituted "interrogation" under the meaning of *Miranda*. We hold that appellant's Fifth Amendment rights were not violated under any standard of review, much less under plain error.

### III.   Conclusion

We affirm the trial court's denial of the motion to suppress. Officer Mundt initiated a traffic stop of the sedan in which appellant was traveling after observing the vehicle twice "veer" onto the painted lines separating one lane from another. Officer Mundt's belief that this violated 18 D.C.M.R. § 2201.6, which requires the vehicle to travel as "nearly as practicable within a single lane of travel," was reasonable (and, indeed, correct as a matter of law) and thus, the resulting traffic stop was lawfully initiated. We also hold that appellant's Fifth Amendment rights were not violated when Officer Torres asked him about the location of a bottle of alcohol because appellant was not "in custody" under the meaning of *Miranda* at the time. Therefore, we affirm the trial court's denial of appellant's motion to dismiss.

*So ordered.*