*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-2063

FREDRICK E. MORTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-2583-12)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued November 19, 2014                    Decided October 29, 2015)

*Justin Murray*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *Thomas A. Bednar*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, BLACKBURNE-RIGSBY, *Associate Judge*, and FERREN, *Senior Judge*.

Opinion for the court by *Chief Judge* WASHINGTON.

Concurring opinion by *Senior Judge* FERREN at page 20.

WASHINGTON, *Chief Judge*:   Appellant Fredrick E. Morton ("Mr. Morton")

was charged with a series of crimes[1] in connection with a burglary in which he allegedly broke into an apartment and stole several items including a wallet, credit cards, and a set of car keys which were used to steal a car parked nearby. Before trial, Mr. Morton filed a motion to suppress certain incriminating statements he made immediately prior to his formal arrest, arguing that he was handcuffed and interrogated by police without the protection of *Miranda*[2] warnings in violation of his Fifth Amendment rights. The trial court denied the motion, and the government used appellant's non-Mirandized statements to connect him to the stolen items. The jury acquitted appellant on all charges except for one felony receiving stolen property (RSP) count predicated on the stolen car, and one misdemeanor RSP count predicated on the wallet and credit cards. On appeal, Mr. Morton asserts that the trial court erred in concluding he was not in custody for purposes of *Miranda* at the time he made incriminating statements. Mr. Morton argues he was in *Miranda* custody, given that he was stopped on the suspicion of drug activity, chased by police, apprehended, handcuffed, and subsequently questioned about circumstances concerning his involvement in a crime. We conclude that, based on the totality of the circumstances in this case, a reasonable person, in appellant's position, would

---

[1] Mr. Morton was charged with second-degree burglary, first-degree theft, unauthorized use of a motor vehicle, credit card fraud, receiving stolen property ("RSP") predicated on a wallet and credit cards and RSP predicated on a vehicle.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

not have felt free to leave and terminate police questioning and was subject to a restraint on his freedom of movement tantamount to formal arrest. Because Mr. Morton was in *Miranda* custody during the police questioning, he was entitled to Fifth Amendment protections before the officers questioned him, and therefore, the trial court erred in denying the motion to suppress his incriminating statements.

## I.  Facts and Procedural History

On June 28, 2009, at approximately 8:50 a.m., Metropolitan Police Department Officers Randy Washington and Travis Gray were on patrol in an area in Northeast D.C. known for drug activity when they observed three men, including Mr. Morton, standing together in an alleyway near a park. Officer Washington testified that Mr. Morton appeared to be engaging in a "hand-to-hand" transaction. Officer Washington did not see objects exchanged, but he suspected drug activity and instructed Officer Gray to pull over to investigate. The officers got out of their vehicle, approached the group, asked what they were doing, and requested to see identification. Two of the men showed identification, but Mr. Morton patted his pockets as if to look for identification and fled. Officer Gray pursued appellant on foot, and after briefly staying with the other two men, Officer Washington followed his partner. As Mr. Morton was running, Officer Washington saw Mr. Morton

throw a small object to the ground. Officer Washington went to the area where he had seen the object land and found a wallet, which contained various cards and identification.

Meanwhile, Officer Gray stopped appellant approximately 200 yards away from where the officers had first seen the men. Officer Washington went to where his partner had appellant detained. Mr. Morton was placed in handcuffs, which Officer Washington testified was for the purpose of Mr. Morton's and the officers' safety. Neither of the officers brandished their weapons. Officer Washington testified that Mr. Morton "was not under arrest, but was detained." After appellant was handcuffed, Officer Gray informed appellant that he was not under arrest, but stated, "We need to know why you ran. Why would you run if you didn't do anything?" Appellant responded that he ran "because [he] had a needle" on him. The officers then asked Mr. Morton's name, and he responded that it was "Michael Morton" and provided a date of birth. After the officers ran a check on the name and it did not meet appellant's description, the officers engaged in a "back and forth" with Mr. Morton concerning his identity, and Mr. Morton ultimately provided his true name. While waiting for the dispatcher to obtain Mr. Morton's true name, Officer Washington began to question Mr. Morton about the wallet he saw him

throw while being pursued.[3]  Specifically, Officer Washington asked, "What was up with the wallet?"  Mr. Morton responded, "What wallet?" and Officer Washington replied, "The wallet that you threw.  It's right behind you.  I saw you throw a wallet.  What's up with the wallet?"  Appellant responded, "[O]h, I found it on the metro."  The officers then received the results of the name check from the dispatcher, who informed the officers of a warrant for Mr. Morton's arrest (for reasons unrelated to this case).  At that point, Mr. Morton was placed under formal arrest and searched.  Among the items the police found on him were a set of car keys, a Safeway receipt, and a business card for a pawn shop.

Officer Washington testified that later that day, after he arrested Mr. Morton, he took the keys and wallet and drove to the address listed on the identification contained in the wallet.  The resident of that address, Kwesi Cobbina ("Mr. Cobbina"), informed Officer Washington that his apartment had been burglarized recently, that his wallet and keys had been stolen during the burglary along with his car, and that a credit card had been fraudulently used at a Safeway store.  Officer

---

[3] There is no finding, and the record does not explicitly state at what point Officer Washington looked into the wallet and discovered that it contained identification belonging to a person other than Mr. Morton, but it can be inferred from the transcript that the trial court and defense counsel believed that the officer had done so before he questioned Mr. Morton about his identity and about the wallet during his detention.  Defense counsel acknowledged, however, that "it's unclear to me" what the officers knew when questioning began.

Washington returned the wallet and keys to the owner, and did not preserve them as evidence or take photos of them. The next day, Officer Washington returned to the area of Mr. Morton's arrest, where he found Mr. Cobbina's car, containing a needle wrapper, which Mr. Cobbina stated was not in the car before the theft.

On February 8, 2012, appellant was charged with second-degree burglary,[4] first-degree theft,[5] unauthorized use of a vehicle ("UUV"),[6] credit card fraud,[7] misdemeanor receiving stolen property predicated on a wallet and credit cards (RSP),[8] and felony RSP predicated on a vehicle.[9] Before trial, appellant filed a motion to suppress his statements under *Miranda*, and after a hearing, the trial judge denied the appellant's motion based on her conclusion that Mr. Morton was not in custody for purposes of *Miranda* at the time he was interrogated by police. The government made use of appellant's incriminating statements to show that appellant possessed Mr. Cobbina's property and that he did so with knowledge that it was

---

[4] D.C. Code § 22-801 (b) (2012 Repl.).

[5] D.C. Code §§ 22-3211, -3212 (2012 Repl.).

[6] D.C. Code § 22-3215 (2012 Repl.).

[7] D.C. Code § 22-3223 (b)(1)(d)(1) (2012 Repl.).

[8] D.C. Code § 22-3232 (a), (c)(2) (2012 Repl.).

[9] D.C. Code § 22-3232 (a), (c)(1) (2012 Repl.).

stolen. Mr. Morton was tried by a jury and was acquitted on all charges except the felony RSP charge and the misdemeanor RSP charge. Appellant was sentenced to one year of imprisonment for the misdemeanor RSP conviction and seven years of imprisonment for the felony RSP conviction, to run concurrently. This appeal followed.

## II.    Standard of Review

When reviewing a denial of a motion to suppress, this court defers to the trial court's factual findings unless clearly erroneous and considers all inferences in favor of the prevailing party. *See Griffin v. United States*, 878 A.2d 1195, 1198 (D.C. 2005). All legal conclusions are reviewed *de novo*, including whether a suspect was in custody for purposes of *Miranda*. *In re I.J.*, 906 A.2d 249, 261-62 (D.C. 2006) ("This court will defer to the trial court's findings of fact, but will review *de novo* whether, on those facts, the person was in custody.").

## III.    Analysis

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

Under *Miranda v. Arizona*, this constitutional rule precludes the prosecution's use in its case-in-chief of statements that have been elicited during custodial interrogation without the benefit of "prophylactic warnings . . . which inform criminal defendants of various constitutional rights," regardless of whether those unwarned statements would otherwise be considered "compelled." *In re I.J.*, 906 A.2d at 255; s*ee White v. United States*, 68 A.3d 271, 276 (D.C. 2013). *Miranda* warnings are required whenever a suspect is both (1) in custody and (2) under interrogation. *Id.* In the present case, the government does not contest that the appellant was subjected to interrogation when Officer Washington questioned him about why he fled and why he threw a wallet while being pursued. Thus, the only question before the court is whether Mr. Morton was in custody for purposes of *Miranda* when the police questioned him.

In determining whether a person is in custody for *Miranda* purposes, the court must look to the totality of the circumstances surrounding the interrogation and then determine whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave. *See id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also United States v. Turner*, 761 A.2d 845, 851 (D.C. 2000) ("The test for determining whether a person is in custody is an objective one . . . 'based upon looking at the totality of the

circumstances.'"). However, the mere fact that a suspect has been detained by police—and thus is not free to leave— is not alone sufficient to constitute *Miranda* custody. *Id.* "Custody is clearly more than seizure alone." *Id.* The court must apply an objective test to resolve the "ultimate inquiry," which is to determine whether there was either a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *In re I.J.*, 906 A.2d at 255 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Accordingly, the focus of the inquiry in the present case should be on how a reasonable person in Mr. Morton's position would have perceived his situation at the time he was questioned.[10]

---

[10] At oral argument, the government contended that the "reasonable person" test presupposes a "reasonable *innocent* person," as opposed to simply a "reasonable person" in the defendant's position, the latter of which could involve an analysis of the mental state of a person who has knowledge of his own guilt. This court has said, in dicta, that the "reasonable innocent person" analysis applied in Fourth Amendment contexts similarly applies in Fifth Amendment contexts. *See, e.g.*, *White*, 68 A.3d at 276 n.8; *Griffin*, 878 A.2d at 1198 (relying on Fourth Amendment analysis in *United States v. Gayden*, 492 A.2d 868, 872 (D.C. 1985)); *Castellon v. United States*, 864 A.2d 141, 152 (D.C. 2004); *Turner*, 761 A.2d at 851 n.7 (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). We decline to decide the issue, however, because although in the present case Mr. Morton was aware of his guilt when he was apprehended and questioned, we hold that he was in custody for *Miranda* purposes under either construction of the "reasonable person" test.

This court has acknowledged that "the task of defining 'custody' is a slippery one." *White*, 68 A.3d at 279 (citing *In re D.W.*, 989 A.2d 196, 201 (D.C. 2010)). Indeed, there is no bright-line rule "to save courts from 'occasionally [having] difficulty deciding exactly when a suspect has been taken into custody.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). In *In re I.J.*, this court observed that confusion may arise in differentiating between a Fourth Amendment seizure analysis and a Fifth Amendment custody analysis. *In re I.J.*, 906 A.2d at 257 (quoting *Miley v. United States*, 477 A.2d 720 (D.C. 1984)) ("[E]xperience demonstrates that the reach of *Miranda* is sometimes blurred in circumstances involving a *Terry* encounter and the parameters of the terms 'custody' and 'arrest' may change with the context."); s*ee Turner*, 761 A.2d at 851 ("On a fundamental level, 'seizure' and 'custody' are not synonymous.") (internal citation omitted). The fact that an encounter may be a reasonable seizure within the scope of *Terry* for Fourth Amendment purposes does not automatically and necessarily remove it from *Miranda's* Fifth Amendment protections.[11]  *See White*, 68 A.2d at 284 (citing *In re D.W.*, 989 A.2d at 201 ("[I]t is clear . . . that an individual may be in custody even when he was not been formally arrested.")). The court in *In re I.J.* explained this in the following way:

> Should the circumstances so dictate, a person may be seized—stopped,

---

[11] *Terry v. Ohio*, 392 U.S. 1 (1968).

frisked, handcuffed, detained, transported in a police vehicle to another location (including a police station) and briefly questioned—so as to allow a *Terry* investigation on reasonable articulable suspicion without the encounter being deemed an arrest, within the meaning of the Fourth Amendment, requiring probable cause. However, if the same tactics that may be permitted by the Fourth Amendment would cause a reasonable person in the suspect's situation to believe that his freedom of action has been curtailed to a degree associated with formal arrest, there is custody that triggers the additional protections of the Fifth Amendment.

906 A.2d at 260. Accordingly, we proceed in our analysis of the present case with awareness that the standard that applies in Fourth Amendment versus Fifth Amendment contexts is distinct and may produce different outcomes.

When assessing whether a defendant is in *Miranda* custody, this court considers: the degree to which police physically restrain the suspect—including whether police use handcuffs;[12] "[c]ommunications from the police to the suspect," and particularly, whether the police have informed the suspect that he is not under arrest and that he may decline to answer questions;[13] whether interrogation occurs in public or in a "secluded area";[14] the length of the detention and questioning;[15]

---

[12] *White*, 68 A.3d at 279.

[13] *Id.* at 260.

[14] *In re I.J.*, 906 A.2d at 260-61.

whether the police questioning is "inquisitorial" or "accusatory";[16] the show of force or brandishing of weapons by the police;[17] and whether "the suspect is 'confronted with obvious evidence of [his] guilt'" or the police "already have sufficient cause to arrest, and this is known to the suspect."[18] While any of these factors may weigh upon whether a suspect was in *Miranda* custody, "there is no checklist." *White*, 68 A.3d at 282. "[N]o single factor is dispositive," and this court "examines each case on its particular facts, and factors that may be given significant weight in one case may be less important in a different context." *Id.*

Here, appellant was stopped on a public street and restrained with handcuffs after fleeing from and being chased down by the police. He was questioned and confronted with evidence that was at least sufficient to establish probable cause that he had committed a crime. However, he was told by Officer Washington that he was not under arrest before he was questioned. Considering the totality of the circumstances, we conclude that a reasonable person in the place of the appellant

---

(. . . continued)

[15] *In re A.J.*, 63 A.3d 562, 568 (D.C. 2013).

[16] *White*, 68 A.3d at 281.

[17] *Bates v. United States*, 51 A.3d 501, 510 (D.C. 2012).

[18] *White*, 68 A.3d at 261 (quoting *Miley v. United States*, 477 A.2d 720, 722 (D.C. 1984)).

would not have felt free to terminate the police questioning and leave, and the restraint involved in appellant's detainment was congruent to the degree of restraint normally associated with formal arrest. Thus, appellant was in custody for the purposes of *Miranda* when he made incriminating statements.

Mr. Morton's detention by use of handcuffs, although not strictly dispositive on this issue, strongly militates toward a finding of *Miranda* custody. In *White*, this court discussed at length the import that handcuffing a suspect has on the Fifth Amendment custody analysis. That case involved a traffic stop in which the suspect was asked to step out of the car and was handcuffed and asked questions about whether there were illegal drugs in his car. *White*, 68 A.3d at 274. In that case, the court held that handcuffing was a strong indicium of *Miranda* custody. *Id.* at 279-81. The court noted that "handcuffing does not necessarily transform an investigative detention into an arrest, but it is recognized as 'a hallmark of formal arrest.'"[19] *Id.* at 279 (citing *Al-Mahdi v. United States*, 867 A.2d 1011, 1023 (D.C. 2005)); s*ee also New York v. Quarles*, 467 U.S 649, 652, 655 (1984) (finding the

---

[19] The *White* court observed that this court has frequently "pointed to the absence of handcuffing as a reason why a defendant was not in custody for purposes of *Miranda*." *White*, 68 A.3d at 279 (citing nine cases as examples); *see also* 2 WAYNE LA FAVE ET AL., CRIMINAL PROCEDURE § 6.6 (f) (3d ed. 2000) (stating that courts are "likely to find custody if there was physical restraint such as handcuffing").

defendant "undoubtedly" in custody after he was chased by police and restrained in handcuffs); *Thompson v. Keohane*, 516 U.S. at 112; *Al-Mahdi*, 867 A.2d at 1023 (handcuffing is a severe "restraint on freedom of movement of the degree associated with a formal arrest"). In fact, the court in *White* noted that neither this court nor the Supreme Court has ever published an opinion in which it determined that a suspect in handcuffs was not in *Miranda* custody. *White*, 68 A.3d at 279. While handcuffing does not end the inquiry, and must be considered in context of the totality of the circumstances, "in order to outweigh the use of handcuffs," there must be "strong indications on the other side of the ledger" that there was not *Miranda* custody. *Id.*

The government argues that in the totality of the circumstances, a reasonable person in appellant's situation would not have believed that his freedom had been restrained to the degree associated with a formal arrest, and therefore, Mr. Morton was not in custody when he made incriminating statements. In particular, the government asserts that although Mr. Morton was handcuffed, he would not have reasonably believed the police intended to arrest him because they told him he was not under arrest and because their questioning was merely investigatory and not accusatory or inquisitorial. Moreover, the government argues, because Mr. Morton was questioned on a street and in view of the public, and his detention was

conducted by only two officers who did not brandish weapons, he was not in *Miranda* custody. We address each of these arguments in turn.

First, the government argues that because the police told appellant that he was not under arrest, this court, unlike in *White*, should hold that he was not in custody for *Miranda* purposes. While the government is correct in its contention that "[c]ommunications from the police to the suspect" are a factor in the *Miranda* custody analysis, and such communications "may assuage the reasonable person's assessment of the situation, and militate against a finding of custody," the government's argument ignores the fact that appellant was never told that he did not have to answer questions posed by the police. *In re I.J.*, 906 A.2d at 260; *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("[T]he lack of police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention."). This court has stated that "where the police specifically inform the suspect that he or she is not under arrest, *and does not need to talk to the police*, a stop for investigatory purposes is unlikely to be custodial." *In re I.J.*, 906 A.2d at 260 (emphasis added). Appellant was never told that he was at liberty to decline to answer questions or that he was free to leave. Under those circumstances, courts, including this court, have concluded that a handcuffed suspect is in custody for *Miranda* purposes. *See*

*Griffin*, 7 F.2d at 1518; *Broom v. United States*, 118 A.3d 207 (D.C. 2015) (finding custody where officers handcuffed the defendant and instructed him he was "not under arrest" before asking accusatory questions); *see also United States v. Cowan*, 674 F.3d 947, 957-58 (8th Cir. 2012) (finding custody where officers handcuffed the defendant and "[n]o one told [him] he was free to leave or to abstain from answering questions"). Notably, this court has emphasized that police pronouncements that a suspect is not under arrest carry less weight in the *Miranda* custody analysis when the officer's statement is made to a suspect who is nonetheless confronted with "the type of formality that a lay person might reasonably view as having all the indicia of a formal arrest."[20] *See Turner*, 761 A.2d at 852-53 (emphasis added) (finding

---

[20] Other jurisdictions take a similar approach. The Second Circuit in *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) explained:

> [T]elling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained. . . . Although a reasonable person told, as Newton was, that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing [custody]—a reasonable person would also have understood that as long as the handcuffs remained in place, his freedom of movement . . . would be restricted to a degree comparable to that of an individual placed under formal arrest. . . . [W]e cannot assume that a reasonable person in his situation would have understood that the handcuffing would likely last only until the officers had completed their search. Neither can we assume an understanding that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed. Because *Miranda's* safeguards become applicable as

(continued . . .)

custody where officers told the defendant he was "not under arrest" but also informed him about a search warrant allowing them to obtain hair samples and bodily fluids from him); *see also In re J.F.*, 987 A.2d 1168, 1176 (D.C. 2010) (finding that although the defendant was not initially in custody because he was not handcuffed and was told he was "not under arrest and he was free to leave," he was later in custody when officers "became more confrontational" and told him, "before we let you go, you need to sit here and tell us how [the sexual assault] occurred"); *Ruffin v. United States*, 524 A.2d 685, 698-99 (D.C. 1987) (finding that although the defendant was not initially in custody when he voluntarily came to the police station and was told he was not under arrest, he was in custody when officers later interrogated him in a "coercive atmosphere," and gave him no further "indication . . . that he was entitled to leave"). Accordingly, we conclude that under the circumstances the statement to the appellant that he was not under arrest is not a "strong indication[] on the other side of the ledger that this was not *Miranda* custody" as is necessary when a suspect's freedom of movement is restrained by

---

(. . . continued)

 soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest, we must conclude that handcuffing Newton, though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda*.

*Id.* at 676-77 (internal quotation marks omitted).

handcuffs.   *White*, 68 A.3d at 280.

Next, the government contends that the police questioning was "relaxed" and "not accusatory" in support of their argument that appellant was not in custody. We conclude that the record supports the opposite deduction:  that Mr. Morton faced accusatory and inquisitorial questions, indicating that the police officers believed he had committed a crime.   Thus, the nature of the questioning favors a finding of custody.   The police pressed Mr. Morton with questions that centered on evidence of criminal activity and that presupposed his guilt, asking:   "Why would you run if you didn't do anything?"   "What's up with the wallet?"   "The wallet you threw.  It's right behind you.  I saw you throw the wallet.  What's up with the wallet?"   Notwithstanding the statement by Officer Gray to Mr. Morton that he was not under arrest, a reasonable person under these circumstances, subjected to questions by police about incriminating facts, while handcuffed, "would not . . . feel he was at liberty to stop the questioning and leave," and would have equated such restraint to that of formal arrest.  *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006) (finding custody where the handcuffed defendant was "closely questioned about his possession of weapons" and "asked at least twice to explain the presence of [stolen] cash").

Finally, the government argues that because appellant's interrogation was conducted on a public street during the day, lasting only a few minutes, and because the police officers did not brandish their firearms, we should not conclude that appellant was in *Miranda* custody. While these factors lend a measure of support for the conclusion that the questioning was not coercive, we hold that they do not tip the scale away from a finding of custody in light of Mr. Morton's physical restraint and the nature of his questioning, discussed above. Even if handcuffing Mr. Morton was an appropriate measure used to enable the officers to conduct an investigation under the Fourth Amendment, the additional circumstances surrounding appellant's detainment placed him in custody, thus entitling him to *Miranda* warnings under the Fifth Amendment.[21]

## IV.    Conclusion

---

[21] As we explained in *In re I.J.,* "[w]hen an encounter becomes dominated by police authority, the Fourth Amendment of the Constitution may not operate to prevent the investigation, but the Fifth Amendment may require that officers must make a choice—if they are going to take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights." *In re I.J.*, 906 A.2d at 260 (quoting *United States v. Perdue*, 8 F.3d 1455, 1465 (10th Cir. 1993)).

In sum, we hold that, under the totality of the circumstances, the trial court erred in finding Mr. Morton was not in custody for *Miranda* purposes, and subsequently erred in denying his motion to suppress the statements used against him at trial.[22]

*Reversed and remanded.*[23]

FERREN, *Senior Judge,* concurring:   In footnote 10 of the court's opinion we observe that, in determining "custody" under *Miranda*[1] — an analysis that turns, in part, on the suspect's mindset ("Am I free to leave or under arrest?") — this court has said four times, "in dicta," that the Fifth Amendment mindset is that of a "reasonable *innocent* person."[2]   We, therefore, were saying that ascertainment of

---

[22]   The government does not dispute appellant's contention that any error in the admission of appellant's statements to the officers while detained was not harmless beyond a reasonable doubt.

[23]   Appellant also argues that his convictions for RSP should merge. Because we reverse his convictions on the Fifth Amendment claim, we decline to address the merger argument.

[1]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]   *United States v. Turner*, 761 A.2d 845, 851 n.7 (D.C. 2000) (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (holding that police officers' request that bus passenger consent to search of luggage did not constitute "seizure" under Fourth Amendment)); *Castellon v. United States*, 864 A.2d 141, 152 (D.C. 2004) (quoting *Turner*, 761 A.2d at 851 n.7 (quoting *Bostick*, 501 U.S. at 438)); *Griffin v. United States*, 878 A.2d 1195, 1198 (D.C. 2005) (relying on Fourth Amendment

(continued . . .)

this mindset under the Fifth Amendment presupposes the same, objective assessment employed by the police when resolving, under the Fourth Amendment, whether a suspect has consented, without coercion, to a search.[3]

I believe that the dictum equating these Fourth and Fifth Amendment assessments is substantially overstated. According to the Supreme Court, a police officer's "knowledge or beliefs" casting suspicion on a detainee — if "conveyed by word or deed" to that detainee — are relevant to the extent they would affect "how a reasonable person in that position would perceive his or her freedom to leave."[4] "Custody," therefore, is not determined by assuming automatically that the detainee's state of mind, in responding to police questions, will always be that of a

---

(. . . continued)
analysis in *United States v. Gayden*, 492 A.2d 868, 872 (D.C. 1985)); *White v. United States*, 68 A.3d 271, 276 n.8 (D.C. 2013) (quoting *Turner*, 761 A.2d at 851 n.7 (quoting *Bostick*, 501 U.S. at 438)).

[3] *See Bostick*, 501 U.S. at 438 (holding that assessment of "consent" resolved objectively on assumption that passenger was a "reasonable *innocent* person").

[4] *Stansbury v. California*, 511 U.S. 318, 325 (1994) ("[A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.").

reasonable "innocent" person.

# I.

In *Miranda*, the Supreme Court required specified warnings to be given during "custodial interrogation," described as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[5] The Court later made clear that custodial interrogation was not limited to the police station. In a decision addressed to questioning at the suspect's home, the Court reversed the conviction because the "suspect was under arrest and not free to leave."[6] Later *Miranda* decisions clarified that "custody" was not limited to a formal arrest; the Court extended its meaning to curtailment of freedom of action to "a degree *associated with* formal arrest."[7] Custody in the nature of an arrest therefore became the key concept in triggering *Miranda* rights.

---

[5] *Miranda,* 384 U.S. at 444.

[6] *Orozco v. Texas*, 394 U.S. 324, 327 (1969); *see Oregon v. Mathiason*, 429 U.S 492, 494-95 (1977) (confirming that "*Miranda* principle" applies to questioning after suspect "has been arrested and is no longer free to go where he pleases," but finding "no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way").

[7] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (emphasis added) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

When a defendant argued, to the contrary, that *Miranda* warnings were required at a routine traffic stop prior to a formal arrest, the Court demurred. Defendant's argument was based on the language of *Miranda* that mandates warnings when someone, if not formally taken into "custody," is "otherwise deprived of his freedom of action in any significant way."[8] In rejecting this argument, the Court acknowledged that a traffic stop is indeed a "significant" deprivation of freedom.[9] But it declined to grant *Miranda's* language "talismanic power."[10] A routine traffic stop, said Justice Marshall, does not exert "pressures that sufficiently impair [a suspect's] free exercise of his privilege against self-incrimination."[11] As the Court later put it, "'the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody'";[12] the severity of the detention is also a defining factor. In sum, "the 'temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not

---

[8]  *Miranda*, 384 U.S. at 444.

[9]  *Berkemer*, 468 U.S. at 436.

[10]  *Id.* at 437.

[11]  *Id.*

[12]  *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

constitute *Miranda* custody.'"[13]

Eventually, the Supreme Court announced a hybrid, objective test, followed to this day, that knits together (1) the freedom-of-movement inquiry and (2) the degree of detention associated with a formal arrest.

> [1] [Given] the circumstances surrounding the interrogation[,] . . . would a *reasonable person* have felt he or she was not at liberty to terminate the interrogation and leave. [2] Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."[14]

Factors relevant to determining how a reasonable person would have "gauge[d] his freedom of movement" at the time the police confronted him, said the Court, "include the location of the questioning, its duration, statements made during

---

[13] *Id.* (quoting *Shatzer*, 559 U.S. at 113).

[14] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (emphasis added) (internal quotation marks omitted) (quoted in *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)).

This court has combined the two formulations as follows: "whether there was any show of authority or other message conveyed which would cause the suspect to reasonably think he or she was not free to terminate the questioning and leave and that his or her freedom was being restrained to 'the degree associated with a formal arrest.'" *In re I.J.*, 906 A.2d 249, 261 (D.C. 2006) (quoting *Beheler*, 463 U.S. at 1125).

the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."[15]

The objective test for determining custody, including the mindset of a "reasonable person" central to the freedom-of-movement inquiry, is traceable to the Supreme Court's decision in *Berkemer*.[16] There the Court said that the "only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation."[17] The Court quoted a New York decision opining that the "reasonable man test is appropriate because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'"[18]

More recently, in *J.D.B.*, the Supreme Court expanded upon its reasoning in *Berkemer* by emphasizing the irrelevance "of the actual mindset of the particular

---

[15] *Howes*, 132 S. Ct. at 1189 (internal citations omitted).

[16] *Berkemer*, 468 U.S. at 440.

[17] *Id*. at 442.

[18] *Id*. at 442 n.35 (quoting *People v. Rodney P*., 233 N.E.2d 255, 260 (N.Y. 1967)).

suspect subjected to police questioning."[19]  It expressly excluded personal "idiosyncrasies," "particular traits," "unknowable" circumstances, "contingent psychological factors,"[20] and "frailties"[21] from police consideration when sizing up the suspect.  The Court's examples suggest that the definition of an irrelevant mindset is limited primarily to a mental deficiency or other attribute that shortcuts reason.  The concern appears to be that the police could not reasonably be expected to carry out their duties within the bounds of the law if the law governing their conduct gave suspects the benefits of abnormalities that a police officer would not likely perceive.  None of the Supreme Court's examples, however, includes a disqualifying state of mind characterized by guilt rather than innocence.  Nor has the Court to date expressly limited a "reasonable person" for Fifth Amendment purposes to one who is presumed "innocent."[22]

---

[19]  *J.D.B.*, 131 S. Ct. at 2402.

[20]  *Id.* at 2402-04 (internal quotation and citation omitted).  It is interesting to note that in *J.D.B.*, the Court identified a subset of "reasonable person" for *Miranda* purposes, namely, a "reasonable child"— a "reality" that "courts can account for . . . without doing any damage to the objective nature of the custody analysis."  *Id.* at 2403.

[21]  *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).

[22]  *See United States v. FNU LNU*, 653 F.3d 144, 151 n.6 (2d Cir. 2011) ("Whether the reasonable person in the Fifth Amendment *Miranda* inquiry is similarly innocent seems to be an open question.").

At least two federal circuits, moreover, apparently would not exclude a suspect's "guilty state of mind" from influencing his or her mindset for *Miranda* purposes if the reasons for that guilty mind were "apparent to the questioning officer."[23]  The question thus becomes what this possible exception exactly means and whether it provides a sound limitation on wholesale importation of the "reasonable innocent person" from the Fourth Amendment into Fifth Amendment *Miranda* analysis.

## II.

As noted earlier, in a string of Fifth Amendment *Miranda* decisions, this court, in dicta, borrowed the "innocent person" gloss on "reasonable person" from

---

[23]  *Compare United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) ("*Berkemer's* 'reasonable person' does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.") (quoting *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc) ("[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable' person test . . . 'other than to the extent that they may have been known to the officer and influenced his conduct.'")), *and United States v. Galceran*, 301 F.3d 927, 929 (8th Cir. 2002) ("[A] reasonable person 'does not have a guilty state of mind [or] . . . peculiar mental or emotional conditions that are not apparent to the questioning officer.'") (quoting *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)), *with United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) ("[U]nder the objective standard, the reasonable person from whose perspective 'custody' is determined is a reasonable innocent person.") (citing *Bostick*, 501 U.S. at 437-38).

the Supreme Court's Fourth Amendment jurisprudence.[24] The Supreme Court announced the "innocent person" limitation in *Bostick*,[25] a Fourth Amendment case in which police officers on a bus, without initially seizing a passenger, asked him whether they could inspect his luggage. He consented. The officers found drugs. In support of the passenger's motion to suppress, counsel argued that his client had been unlawfully seized because he could not have "reasonably" consented to the search; no guilty person, knowing the drugs were in the suitcase, would have done so, said counsel. Rejecting that argument, the Supreme Court ruled that under the Fourth Amendment, the issue of consent should be resolved objectively, solely from the police perspective, as though the passenger were a "reasonable *innocent* person."[26] This presumed state of mind is essential, the Court implied, in order to assure that the police, in approaching a suspect, will apply a common, objective standard — unaffected by the suspect's unknowable mindset — for determining

---

[24] See *supra* note 2. At least four states (and probably more) have similarly done so, including <u>Wisconsin</u>, *State v. King*, 508 N.W.2d 74 (Wis. Ct. App. 1993) (citing *Bostick*, 501 U.S. at 438), <u>Texas</u>, *Blanks v. State*, 968 S.W.2d 414, 419 (Tex. App. 1998) (citing *Bostick*, 501 U.S. at 438; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)), <u>Virginia</u>, *Jones v. Commonwealth*, 2009 Va. App. LEXIS 183, at *5 (Va. Ct. App. 2009) (quoting *Bostick*, 501 U.S. at 438), and <u>Illinois</u>, *People v. Jeffers*, 849 N.E.2d 441, 446 (Ill. Ct. App. 2006) (citing *Bostick*, 501 U.S. at 438).

[25] *See Bostick*, 501 U.S. at 438.

[26] *Id.*

whether a purportedly consensual search would nonetheless amount to an unlawful "seizure."[27]

Years later, in *I.J.*, this court observed that "the Fourth Amendment inquiry is not the same as, nor does it ultimately decide, the question of whether there was custody under the Fifth Amendment. . . . The distinction is based on the different interests which the two amendments safeguard."[28] The Fourth Amendment, we said, accommodates a police officer's perspective ("the public's interest in effective on-the-scene investigative work") — the perspective from which the constitutional validity of a "seizure" is judged.[29] The Fifth Amendment jurisprudence from which "custody" is evaluated, however, reflects the suspect's perspective (shielding the "suspect from compelled self-incrimination") — a protection that "places a much higher value on the individual right at stake than on the needs of law enforcement."[30]

Thus this question: can a detained suspect's subjective awareness of his guilt ever support an objective determination that, as a reasonable person, he did not feel

---

[27] *See id.* (quoting *Florida v. Royer*, 460 U.S. 491, 519 n.4 (1983) (Blackmun, J., dissenting); *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)).

[28] *In re I.J.*, 906 A.2d at 257-58.

[29] *Id.* at 258.

[30] *Id.* at 259.

free to end the police questioning and leave — contrary to the dictum that would limit his mindset to that of a reasonable "innocent" person?

We begin with *Stansbury*, in which the Supreme Court explained that a police officer's own "subjective view" about the guilt of a detainee under questioning "does not bear upon the question whether the individual is in custody for purposes of *Miranda*,"[31] with one clear exception: "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed by word or deed to the individual being detained."[32] When that happens, "those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"[33] Or, more specifically, as the Court summarized its ruling a few sentences later:

> [A]n officer's . . . beliefs concerning the potential culpability of the individual being questioned[] may be one among many factors that bear upon the assessment whether the individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive

---

[31] *Stansbury*, 511 U.S. at 324.

[32] *Id.* at 325.

[33] *Id.* (quoting *Berkemer*, 468 U.S. at 440).

his or her freedom to leave.[34]

Accordingly, as we have said, if the detainee were to be confronted with "obvious evidence of guilt," he could readily assume that "he would not be allowed to leave,"[35] for he would be confronted with probable cause to arrest. But *Stansbury* goes further. It permits the officer's "knowledge" or "views" or "beliefs" about the detainee's guilt, short of probable cause, to influence the detainee's state of mind for *Miranda* purposes if "conveyed" or "manifested" to the detainee "by word or deed."[36]

It is important to emphasize that this Fifth Amendment analysis does not credit the detainee with information unknown to the police, such as the personal

---

[34] *Id.*

[35] *Miley v. United States*, 477 A.2d 720, 722 (D.C. 1984). This court offered the same reasoning in *In re I.J.*: "What otherwise would be a permissible *Terry* stop should be deemed an arrest, necessitating *Miranda* warnings, when the suspect is 'confronted with the obvious evidence of guilt.' Because *Miranda's* focus is on the perceptions of the reasonable person, it is necessary to recognize that a suspect would reasonably believe that the police intend to arrest him because the police have evidence against him." *In re I.J.*, 906 A.2d at 261 (quoting *Miley*, 477 U.S. at 722 (other citations omitted)).

[36] *Stansbury*, 511 U.S. at 325.

idiosyncrasies and other "unknowable" circumstances referenced earlier in *J.D.B.*[37] and *Alvarado*.[38]   Thus, as long as the detained suspect is unaware of any concrete suspicion or evidence of his guilt harbored by the police, that detainee can be presumed under the Fifth as well as the Fourth Amendment to have an innocent mindset for purposes of assessing whether he, as a reasonable person, would — or would not — feel free to "terminate the interrogation and leave."[39]

In no way, therefore, is law enforcement prejudiced by permitting the detained suspect to take into account what the police already know.   The suspect would be prejudiced, however, if his privilege against self-incrimination were compromised by deeming him a reasonable "innocent" person for purposes of determining his mindset when a truly reasonable person in his position would factor in his guilty actions, known to the police, when considering whether he felt free to snub police questioning and leave the scene.

In the present case, the police knew that appellant Morton was aware that the police had seen him flee at high speed when he saw them approaching — an action

---

[37] *J.D.B.*, 131 S. Ct. at 2402.

[38] *Alvarado*, 541 U.S. at 662.

[39] *Thompson*, 516 U.S. at 112.

reflecting consciousness of guilt. And the officers saw him throw away what turned out to be a wallet as he ran. Upon apprehending Morton, the officers knew they would ask him, "We need to know why you ran. Why would you run if you didn't do anything?" ("I had a needle on me"). And, "I saw you throw a wallet. What's up with the wallet"? ("I found it on the [M]etro"). Morton, of course, knew that the police had seen his flight, and although the police may not have looked into the wallet when they asked him about it, they had to know that it might well elicit at least a questionable, even incriminating, response, which it did.[40] Under these circumstances, the police conveyed by "word" and "deed" to Morton their "knowledge" and "beliefs" reflecting suspicion of his guilt, inevitably affecting how Morton would "gauge the breadth" of his "freedom of action"[41] — if any.

Under these circumstances, therefore, Morton's guilty actions — easily perceived by the police before they spoke to him (and confirmed by his responses about the "needle" and the "Metro") — comprised a legitimate, indeed compelling factor in assessing Morton's mindset before the police began to ask questions. And

---

[40] Even though in asking Morton about the wallet the officer may not yet have looked inside and found the incriminating credit card and keys, Morton did not know that; he had every reason to believe that the police had inspected the wallet and thus had evidence that would inevitably lead to his prosecution.

[41] *Stansbury*, 511 U.S. at 325.

that mindset, inevitably informed by police awareness of his flight and the wallet, almost assuredly would have convinced Morton that he could not end the questioning and leave — even without reference to his handcuff restraints. As a "reasonable person" evaluating his options, his incriminating actions, not innocence, informed his state of mind. The police should have understood that and given *Miranda* warnings before they began to interrogate Morton.[42]

*****

On four occasions this court has erroneously stated, in dictum, that for purposes of ascertaining "custody" under *Miranda*, "[t]he reasonable person test presupposes an innocent person."[43] In my judgment, however, the correct rule of law, reflecting *Stansbury*, should be expressed more narrowly, permitting on

---

[42] The government acknowledges in its brief (p. 28) that Morton "was interrogated," presumably because the questions were sufficiently accusatory to reach the required level of compulsion. Not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. . . . 'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment.' . . . 'Interrogation,' as conceptualized in the *Miranda* decision, must reflect a *measure of compulsion above and beyond that inherent in custody itself*." *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980) (emphasis added) (quoting *Miranda*, 384 U.S. at 478).

[43] See *supra* note 2.

occasion the determination of a "reasonable person" by reference to his or her guilty

mind — as follows

> Under the Fifth Amendment, for purposes of ascertaining "custody" under *Miranda*, the reasonable person test presupposes an innocent person *unless* the investigating police officer, by word or deed, conveys to the detained individual the officer's knowledge or beliefs, reflecting suspicion or evidence of guilt, that would likely affect how a reasonable person in that position would perceive his or her freedom to leave. In that case, the reasonable person test shall attribute to the detainee a mindset that takes into account what he or she has learned from the investigating officer.